UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                    :

UNITED STATES OF AMERICA        :

                                     :     S1 19 Cr. 716 (DLC)

        -  v.  -          :

                                     :

TELEMAQUE LAVIDAS,         :

                                     :

                     Defendant.    :

                                     :

---------------------------------------------------x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                             AUDREY STRAUSS
                                             Attorney for the United States,
                                             Acting Under Authority Conferred by
                                             28 U.S.C. § 515


Richard Cooper
Daniel Tracer
Assistant United States Attorneys
     *- Of Counsel -*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

I. The Government Should Be Permitted to Introduce Certain Out-of-Court Statements by Nikas About Insider Trading in Ariad .............................................................................................. 1

  A. Relevant Background .................................................................................................. 2

    1. The Nikas-████ Statement[1] .................................................................................... 2

    2. The Nikas-████ Statement ...................................................................................... 3

    3. The Nikas-████ Statement ...................................................................................... 4

  B. Applicable Law ........................................................................................................... 5

    1. Co-Conspirator Statements .................................................................................... 5

    2. Statements Against Interest .................................................................................... 7

  C. Discussion ................................................................................................................... 8

    1. The Nikas Statements Are Co-Conspirator Statements .......................................... 8

    2. The Nikas Statements Are Admissible as Statements Against Interest ..................... 11

II. The Government Should Be Permitted to Introduce Trading Records of Individuals Who Received MNPI from Nikas ............................................................................................... 13

  A. Relevant Background .................................................................................................. 14

  B. Applicable Law ........................................................................................................... 14

  C. Discussion ................................................................................................................... 15

III. The Government Should Be Permitted to Introduce Evidence About the Defendant's Understanding of Nikas's Other Insider Trading Activity ....................................................... 17

  A. Relevant Background .................................................................................................. 17

  B. Discussion ................................................................................................................... 18

IV. The Defendant Should Be Precluded from Offering Evidence that he was Notified of Legal Process on his Email Account in 2018 ................................................................................. 19

  A. Relevant Background .................................................................................................. 20

  B. Applicable Law ........................................................................................................... 20

  C. Discussion ................................................................................................................... 21

CONCLUSION .................................................................................................................... 24

---

[1] The Government has redacted certain portions of this memorandum pursuant to the Protective Order in this case.

## TABLE OF AUTHORITIES

**CASES**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ............................................................ 5

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................ 15

*Linde v. Arab Bank, PLC*, 04 Civ. 2799 (BMC), 2013 WL 4516778 (E.D.N.Y. Aug. 23, 2013) 20

*Torres v. Smith*, No. 03 Civ. 906 (WHP), 2005 WL 1580608 (S.D.N.Y. July 6, 2005) ............. 21

*United States v. Ballesteros Gutierrez*, 181 F. Supp. 2d 350 (S.D.N.Y. 2002) ........................... 15

*United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ................................ 6

*United States v. Connolly*, 16 Cr. 370 (CM) (S.D.N.Y. May 15, 2018) ...................................... 21

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) ...................................................... 15, 17

*United States v. Del Carmen*, No. 01 Cr. 420 (LAK), 2002 U.S. Dist. LEXIS 14030 (S.D.N.Y.

   Aug. 1, 2002) ........................................................................................................ 21

*United States v. Dove*, 884 F.3d 138 (2d Cir. 2018) ............................................................. 6

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) .............................................................. 7, 11

*United States v. Ferguson*, 246 F.R.D. 107 (D. Conn. 2007) ...................................................... 15

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) ............................................................ 6, 8, 9

*United States v. Geisen*, 612 F.3d 471 (6th Cir. 2010) .............................................................. 21

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ............................................................ 5, 6, 7

*United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979) .............................................................. 5

*United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. May 13, 2011) .................................... 21

*United States v. Grant*, 338 Fed. App'x 19 (2d Cir. 2009) ...................................................... 21

*United States v. Greene*, 995 F.2d 793 (8th Cir. 1993) ............................................................ 21

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) .............................................................. 7, 8

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ........................................................... 6

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) ...................................................... 6, 9

*United States v. Nguyen*, 507 Fed. App'x 64 (2d Cir. Jan. 8, 2013) ........................................... 21

*United States v. Ojudun*, 915 F.3d 875 (2d Cir. 2019) ............................................................ 7

*United States v. Paredes*, 176 F. Supp. 2d 183 (S.D.N.Y. 2001) ............................................. 5, 6

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) .............................................................. 15

*United States v. Rajaratnam*, 13 Cr. 211 (NRB) .............................................................. 21, 22

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) ........................................................ 19

*United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) ............................................................. 8

*United States v. Wilson*, No. 98 Cr. 640 (DLC), 1998 WL 770561 (S.D.N.Y. Nov. 4, 1998) ..... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in advance of the trial of defendant Telemaque Lavidas (the "defendant"), scheduled to begin on January 6, 2020, and in support of its motions *in limine* to (a) admit certain statements by co-defendant Georgios Nikas ("Nikas") related to insider trading in Ariad Pharmaceutical, Inc. ("Ariad') from 2013 through 2015 as both co-conspirator statements and statements against interest; (b) admit relevant evidence of timely, profitable trading in Ariad by other individuals who received inside information about Ariad from Nikas; (c) to admit relevant evidence of communications between the defendant and Nikas about insider trading in companies other than Ariad; and (d) to preclude the defendant from introducing evidence that he learned of legal process from Google in 2018.

Relevant factual background relating to this case and the procedural history of these proceedings are set forth in detail in the Government's December 4, 2019 opposition to the defendant's pre-trial motions.  (ECF Dkt. No. 43 at 2-10).  Additional factual background is set forth below as relevant to each of the Government's motions *in limine*.

## I.  The Government Should Be Permitted to Introduce Certain Out-of-Court Statements by Nikas About Insider Trading in Ariad

The Government first requests a ruling permitting the Government to elicit testimony about, and offer exhibits relating to, certain out-of-court statements made by Nikas concerning his insider trading in Ariad.  These statements are independently admissible both as statements in furtherance of the conspiracy between the defendant and Nikas, and as statements against Nikas's interest.   It was reasonably foreseeable to the defendant that Nikas would share Ariad MNPI with others, and the statements that Nikas made to these close friends and associates about the Ariad MNPI bear strong indicia of reliability.

### A.  Relevant Background

As alleged in the Superseding Indictment, the defendant provided Nikas with material, non-public information ("MNPI") concerning Ariad on four occasions between 2013 and 2015.   The defendant provided these tips to Nikas in exchange for money, to induce Nikas to invest in the defendant's company, and to further a personal and professional relationship with Nikas, an established businessman in the food industry.   Nikas subsequently placed timely, profitable trades based on that MNPI and passed some of that MNPI on to other traders, including ██████████ ██████████████████████████████████████████████████████.   All three of these individuals had close personal relationships with Nikas, and the defendant had met at least two of them – ██████████████.   ██████████████████   all then engaged in timely, profitable securities trading in Ariad in parallel to Nikas's own trading in Ariad.   Nikas is currently a fugitive living in Greece.

### 1.  The Nikas-████████ Statement

At all times relevant to the Superseding Indictment, ██████ ███████████████ ████████████   was a Swiss trader residing primarily in Switzerland.   ████████████ ████████████   ████████   has been a close friend of Nikas for at least ten years.   Nikas introduced ██████   and the defendant in New York prior to the start of the conspiracy, and told the defendant that ██████   was a friend.   ████████   and Nikas were both active stock traders and they shared MNPI with one another from at least 2012 to 2015.   ██████   received MNPI from numerous sources and shared it with numerous tippees, including Nikas.   Nikas provided ██████   with MNPI about just one company – Ariad.   When ██████   and Nikas traded on inside information, they used a number of techniques to mask their trading, including by collecting, or having others generate, analyst reports in order to conceal the fact that they were trading based on MNPI and instead create the appearance that they were making securities transactions based on analyst

research. ████████████████████ shared MNPI with others, and also understood that Nikas sometimes shared MNPI with others as well (even though █████ did not always know the identities of the individuals with whom Nikas shared MNPI).

████████████████████████████████ in approximately 2011, Nikas introduced the defendant to █████████ After that, Nikas explained to █████████ that he was privy to MNPI about Ariad from the defendant and the defendant's father (who was a member of the Ariad board of directors) (the "Nikas-████ Statement"). Nikas thereafter provided MNPI about Ariad to ██████ on two occasions. With the benefit of the Nikas-██████ Statement to give him comfort about the quality and reliability of the MNPI, ████████ placed timely, profitable trades in Ariad securities, and also passed that MNPI to others. The Government is aware of no evidence suggesting that when the defendant passed Ariad tips to Nikas, the defendant requested that Nikas keep the MNPI to himself or otherwise conceal the scheme from Nikas's close associates.

Overall, Nikas and his tippees, including ████████ and his tippees, profited handsomely based on the defendant's MNPI. By trading ahead of the public announcement of market-moving information, they avoided millions of dollars of losses and made millions of dollars in profits. Evidence at trial will also demonstrate that ████████ and other traders also purchased Ariad securities on other occasions where no MNPI had been passed, and on those occasions made meager profits and sometimes lost money.

**2. The Nikas-████ Statement**

At all relevant times, ████████ was another friend of Nikas, and a fellow businessman in the food industry located in New York. The defendant was also an acquaintance of ████████ and communicated with him often, including by text message. As part of Nikas's friendship with ████████ Nikas often talked to ████████ about, among other things, the stock market and stocks to

3

trade.   Beginning in 2013, Nikas also shared with ███ some of the Ariad-related MNPI that he had received from the defendant.   As alleged in the Superseding Indictment, Nikas's first ever purchases of Ariad shares occurred on or about June 28, 2013, just two days before July 1, 2013, when Ariad made a major positive announcement about the approval of one of its drugs in the European Union.   Just over three weeks later, on July 27, 2013, Nikas emailed ███ stating "Was trying to find u 3 weeks ago when I had some seriously juicy info for u but nowhere to be found... No bbm[2] I guess...?"   (*See* Superseding Indictment ¶ 17).   After ███ replied, "Haha. Juicy?", Nikas replied, "Pin:2AF1368D  Let's take it there..."   This email chain is referred to herein as the "Nikas-███ Statement," and is attached hereto as Exhibit A.   Subsequent to the Nikas-███ Statement, ███ traded in Ariad securities (either in his own name or in the names of close relatives) on two occasions (in December 2013 and August 2015) at or around the same times that Nikas traded in Ariad securities based on MNPI he received from the defendant.   (*See* Superseding Indictment ¶¶ 22-29).

### 3.  The Nikas-███ Statement

At all relevant times to the Superseding Indictment, ███ was a close friend of Nikas who worked as a photographer.   The two communicated often, including over email.   ███ made timely, profitable trades in Ariad securities in and around three of the four insider trading incidents referenced in the Superseding Indictment, namely, in October 2013, December 2013, and August 2015.   ███ trading patterns on these three occasions also bear similarity to Nikas's trading patterns.   A few months after the last of these trades, on December 2, 2015, Nikas emailed ███ with copies of three analyst reports, including one about Ariad.   In the subject line of the email, Nikas wrote (as translated from Greek): "Not that it plays a role…"   (the "Nikas-

---

[2] BBM is a reference to Blackberry Messenger, a more secure form of communication that was used by members of the insider trading scheme to communicate about their criminal activities.

█████ Statement," attached hereto as Exhibit B).    In other words, Nikas acknowledged through the Nikas-█████ Statement that the analyst reports were not the true reason for any of their timely, profitable (and parallel) trading in Ariad securities.    The true basis was MNPI provided by the defendant.

### B. Applicable Law

#### 1. Co-Conspirator Statements

Under Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement offered against a party is not considered hearsay when "made by the party's coconspirator during and in furtherance of the conspiracy."    The rule further provides that the "statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it."    Fed. R. Evid. 801(d)(2).    In assessing whether a statement qualifies as co-conspirator statement, the Court may consider inadmissible evidence (such as hearsay) and need only find the relevant facts by a preponderance of the evidence.    *See Bourjaily v. United States*, 483 U.S. 171, 177-78 (1987) (citing Fed. R. Evid. 104(a)); *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999); *United States v. Paredes*, 176 F. Supp. 2d 183, 186 (S.D.N.Y. 2001) ("In order to admit an extra-judicial statement by a coconspirator under Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy.").

A conspiracy involves an "agreement on the essential nature of the plan and on the kind of criminal conduct . . . in fact contemplated."    *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979) (internal quotations and citations omitted).    "To be [] a member of a conspiracy, a defendant need not know every objective of the conspiracy, every detail of its operation or means employed to achieve the agreed-upon criminal objective, or even the identity of every co-conspirator."    *Id.*

(internal quotations and citations omitted); *see also United States v. Dove*, 884 F.3d 138, 147 (2d Cir. 2018) ("[I]t is well settled law that an individual need not know the identities of all coconspirators in order to be found guilty of being a member of a conspiracy.").   As the Second Circuit has recognized, "once a conspiracy is shown to exist, the evidence sufficient to link another [individual] to it need not be overwhelming."   *United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008).   In the context of insider trading, an insider may be found to be in the same conspiracy with a remote tippee if one of the following three scenarios exist: "(1) if the scope of the trading agreement were broader 'to include trading by or for persons other than the small group of conspirators'; (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees."   *United States v. Geibel*, 369 F.3d 682, 690 (2d Cir. 2004) (citing *United States v. McDermott*, 245 F.3d 133, 138 (2d Cir. 2001)).

"[S]tatements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity.   This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy."   *Gigante*, 166 F.3d at 82.   It is also unnecessary for the Government to "show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy," so long as the statement was "in some way have been designed to promote or facilitate achievement of the goals of the conspiracy."   *Paredes*, 176 F. Supp. 2d at 187 (citing *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1198–99 (2d Cir. 1989)). "In addition, while idle chatter among conspirators does not satisfy the in furtherance requirement of Rule 801(d)(2)(E), often these statements are admissible as declarations against penal interest or under the state of mind hearsay exception."   *Gigante*, 166 F.3d at 82.

### 2.   Statements Against Interest

Under Federal Rule of Evidence 804(b)(3)(A), a party may introduce an out-of-court statement made by a declarant who is not available to testify that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or . . . to expose the declarant to civil or criminal liability."   Such a statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."   Fed. R. Evid. 804(b)(3)(B).

"In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first ask whether a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest," *United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014) (internal quotations and citations omitted).   "The statement [need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been probative in a criminal case against him."   *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017) (internal quotations and citations omitted).

In terms of independent corroboration, courts look at "both the declarant's trustworthiness and the truth of the statement"; "the inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable."   *United States v. Ojudun*, 915 F.3d 875, 887 (2d Cir. 2019) (internal quotations and citations omitted).   "In the context of assessing whether a statement against penal interest was sufficiently reliable to satisfy the Confrontation Clause of the Constitution," the Second Circuit has noted that "[a] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions of the statement

that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement."

*Gupta*, 747 F.3d at 127 (quoting *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004)).

## C.  Discussion

The  Nikas-███████  Statement,  the  Nikas-█████  Statement,  and  the  Nikas-███████

Statements  (collectively,  the  "Nikas Statements")  are  independently  admissible  as  both  co-

conspirator statements as well as statements by Nikas that were against his interest.

### 1.  The Nikas Statements Are Co-Conspirator Statements

The Nikas Statements were all made during and in furtherance of a conspiracy involving

the defendant, Nikas, and other downstream tippees to engage in insider trading in the shares of

Ariad.   Although the defendant only shared his stolen MNPI directly with Nikas, in the context

of this case, it was "reasonably fores[eeable], as a necessary or natural consequence of the unlawful

agreement"  that  the  MNPI  would  be  shared  with  Nikas's  other  close  friends  and  associates.

*Geibel*, 369 F.3d at 690.   As an initial matter, the Government is aware of no evidence that the

defendant asked Nikas not to pass on the Ariad MNPI, or otherwise took steps to ensure that the

information  that  he  provided  would  not  be  shared.    In  fact,  Nikas's  subsequent  actions

demonstrate  that  there  was  no  such  agreement.   Nikas  passed  the  Ariad  MNPI  to  at  least  two

individuals – ██████ ██ ████████ – who had met the defendant and could easily contact him.   If

Nikas had an understanding with the defendant – who was one of his closest personal friends –

that he would keep the information confidential, then he would not have breached that trust by

passing it to two people who knew the defendant's telephone number and could easily have told

the defendant that they received Ariad stock tips from Nikas.   Instead, Nikas would have passed

the information to people who did not know the defendant and thus would not be in a position to

reveal to the defendant that Nikas passed the Ariad tips to them.   The fact that the defendant did

not take steps to limit the sharing of MNPI and that Nikas actually shared the MNPI with people

who knew the defendant are thus strong indications that it was reasonably foreseeable to the defendant that MNPI would be shared with these people. They can thus be considered part of the same conspiracy.

These facts also make this case easily distinguishable from *Geibel* and *McDermott* where the Second Circuit found that tippers who had no knowledge about the sharing of MNPI with remote tippees were not in the same conspiracy as those remote tippees.   For one thing, the Court in *Geibel* and *McDermott* emphasized that the tippers did not know who any of the remote tippees even were.   *See McDermott*, 245 F.3d at 138 (holding that, since the tipper had no reason to know of or suspect the downstream tippee's existence, the scope of the conspiratorial agreement involved only the tipper and tippee); *Geibel*, 369 F.3d at 690 ("None of the defendants [downstream tippees] ever communicated directly with [tipper].").   Here, by contrast, the defendant knew at least Markis and ███████   The Court in *Geibel* further emphasized that the tippers in those cases employed safety measures to prevent the information from reaching other individuals.   *See Geibel*, 369 F.3d at 691 ("[I]n light of [tipper] and [tippee's] safety measures, it was not reasonably foreseeable that inadvertent disclosures to remote tippees were a necessary or natural consequence of this trading scheme.").   The Government is unaware of any such evidence in this case.   And, the defendant here well understood that Nikas was an active stock trader, and the two had even discussed the stock market in the past.   This contrasts starkly with *McDermott* where the intermediate tipper had no background in stocks or stock trading.   *McDermott*, 245 F.3d at 138 (noting that the tipper (a prostitute) and tippee were having an affair, and "it is not obvious that it was or should have been within [tipper's] frame of reference that [tippee] would share stock information with others similarly situated, or even that there existed others similarly situated").   Accordingly, and unlike in *Geibel* and *McDermott*, it was reasonably foreseeable to the defendant

that others, like ██████████████, would be provided MNPI by Nikas and drawn into the criminal conspiracy.

Furthermore, by agreeing to provide Nikas with MNPI, the defendant was agreeing to provide Nikas with something of value, and the value of the MNPI was amplified when Nikas could use the MNPI not only to build profitable trading positions himself, but also to provide it to close friends and associates. For example, Nikas's provision of MNPI to ██████ furthered a relationship that, as described above, led to Nikas getting additional, valuable MNPI from ██████ Given the added value that Nikas could get from this MNPI through sharing it, and in light of the circumstances described above, it was reasonably foreseeable to the defendant that Nikas would maximize the value of their stolen Ariad MNPI by trading and tipping other close friends who would also trade.

The Nikas Statements were also clearly made in furtherance of the conspiracy to steal and profit based on Ariad MNPI. When Nikas conveyed to these close friends and associates that he had MNPI (as was expressed in the Nikas-██████ Statement), or talked about his inside source for that MNPI (as was expressed in the Nikas-██████ Statement and the Nikas-██████ Statement), it was not mere idle chatter. Instead, it was a means for Nikas to communicate that the information did not come from market rumor or research, but instead was inside information that could be trusted because it came from an inside source. That kind of detail is exactly what Nikas and the downstream tippees would need before placing bets worth millions of dollars on a single company's stock.

In short, Nikas's tips of Ariad MNPI to ██████████████, were reasonably foreseeable to the defendant and thus their activities were all part of the same conspiracy. Given that the defendant did not place limits on the sharing of MNPI and his understanding that Nikas could profit by sharing it with others, it was reasonably foreseeable that these downstream tips

would occur.   This is especially true where the defendant knew some of these downstream tippees and that they had a relationship with Nikas.   On that basis alone, the Court should admit the Nikas Statements as co-conspirator statements in furtherance of the conspiracy.

**2.  The Nikas Statements Are Admissible as Statements Against Interest**

As a separate, independent basis for admission, the Nikas Statements were clearly contrary to Nikas's penal interest.   As an initial matter, Nikas is a fugitive who is not expected to return to the United States prior to trial.   Second, statements that Nikas made about engaging in insider trading were plainly against his penal interest.   Telling another securities trader that one has access to confidential information from a member of a public company's board of directors (as in the Nikas-████ Statement); that one has "juicy info" about a stock (as in the Nikas-████ Statement); or that one is using analyst reports as cover for inside trading (as in the Nikas-████ Statement) are clearly the kind of statements that would expose the declarant to legal jeopardy. Even if the statements alone could not form the basis for a criminal prosecution, they certainly would be "probative in a criminal case."   *Dupree*, 870 F.3d at 80.   Nikas would never have made these kind of otherwise damning statements unless they were true.

Moreover, the Nikas Statements are all supported by independent corroboration as required by Rule 804(b)(3)(B).   The surrounding circumstances of the particular statements at issue all strongly indicate their trustworthiness.

First, the three Nikas Statements are all mutually reinforcing.   The fact that Nikas independently provided substantially the same information (that he had MNPI about Ariad) to three close friends supports the reliability of those statements.   Each of these three individuals was also a close friend of Nikas, and Nikas would have no incentive to lie about the facts and sources of his Ariad MNPI to these friends.   To the contrary, Nikas would not have wanted to cause his friends to lose money on trading by providing them with false confidence about MNPI

11

– falsities that would clearly come to light if Nikas's information did not pan out.   In fact, if Nikas had lied about the quality of his inside information to these friends he would risk the lucrative insider trading relationship he had with them.   For example, Nikas received MNPI from ████ over the course of many years, and if Nikas had lied about having an inside source at Ariad, Nikas would have risked ████ building a large trading position based on unreliable information and losing money, therefore severely undermined Nikas's ability to continue to get MNPI from ████   Instead, given the long term financial stakes involved, Nikas clearly would have told the truth.   Likewise, Ariad's stock price would quickly tell ████ whether Nikas's information was good or bad, therefore Nikas would not have an incentive to engage in mere puffery or falsely claim that his Ariad information came from the defendant and the defendant's father.

Second, the timing of each of the Nikas Statements corroborates their trustworthiness. The Nikas-████ Statement was first made shortly after Nikas introduced the defendant and ████ and that meeting is what spurred Nikas to share the fact that the defendant was Nikas's source of Ariad MNPI.   The Nikas-████ Statement referred to "juicy info" that Nikas had possessed three weeks prior, and Nikas's first trades in Ariad were approximately three weeks prior.   The Nikas-████ statement was also immediately followed by Nikas shifting the conversation to a more secure and encrypted means of communication (Blackberry Messenger), an indication that Nikas believed the information was something he needed to shield from discovery by law enforcement or regulators.   The Nikas-████ Statement, which represented Nikas's attempt to create a cover story for why he had traded based on Ariad MNPI, was also sent just a few months following the last occasion on which he in fact traded based on Ariad MNPI. At that point, Nikas would have had absolutely no motive to lie by suggesting that he and ████ *had* in fact traded on MNPI.

12

Third, the independent evidence in this case strongly support the reliability of the Nikas Statements – that Nikas had MNPI about Ariad and that the defendant was its source.   In particular, (a) independent evidence (such as testimony and emails) will establish that the defendant's father was a member of the Board of Directors of Ariad, who had access to the MNPI in question, and that Nikas was a close friend of the defendant, and (b) independent evidence (such as trading records) will establish that Nikas in fact placed timely, profitable trades in Ariad based on that MNPI.   As further described below, this trading was remarkably successful and stands in stark contrast to Nikas's trading in Ariad when he did not have MNPI.   Put simply, the other evidence in this case provides strong corroboration for the Nikas Statements about having MNPI and about getting it from the defendant.   This other evidence provides significant proof, certainly by a preponderance of the evidence, that what Nikas was saying under the circumstances can be trusted.

Accordingly, the Nikas-█████ Statement, the Nikas-█████ Statement, and the Nikas-█████ Statement are admissible both as statements in furtherance of the conspiracy as well as statements against interest by Nikas.

## II.  The Government Should Be Permitted to Introduce Trading Records of Individuals Who Received MNPI from Nikas

Second, the Government requests a ruling permitting the introduction of trading records of a number of individuals who received Ariad MNPI either directly or indirectly from Nikas and engaged in timely, profitable Ariad trading.   Those records are admissible – whether or not the traders were co-conspirators with the defendant – to show that Nikas possessed MNPI about Ariad and then tipped others with that MNPI.   Taken together these records are probative of the fact that Nikas and others traded on MNPI rather than based on other, independent sources, such as market research.

### A. Relevant Background

As described above, Nikas obtained Ariad MNPI from the defendant on four occasions and passed that MNPI to others, including ███████████████████.  ██████ also passed that MNPI to other securities traders.   In total, at least eight individuals placed timely, profitable trades in Ariad securities in the wake of MNPI provided by the defendant (collectively, the "Tippee Traders").[3]   After receiving MNPI from Nikas or ██████ some or all the Tippee Traders engaged in timely, profitable trading in Ariad Securities in three of the four insider trading instances alleged in the Superseding Indictment, namely, October 2013, December 2013, and August 2015 (collectively, the "Events").

Evidence at trial will demonstrate that the patterns and results of the Tippee Traders' trading activity was remarkable.   For example, the traders often traded in parallel in ways that strongly suggest that the trading was coordinated rather than coincidental.   In addition, the Tippee Traders' also traded in Ariad securities at times when they did not receive MNPI from Nikas, and the results of those trades were substantially different from the results of trades placed during the Events.   Outside of the Events, the Tippee Traders either made meager profits or lost money.   By contrast, the Tippee Traders earned millions of dollars in profits during the Events.   The Government intends to introduce evidence of these patterns and results through the testimony of a summary witness at trial.

### B. Applicable Law

Under Federal Rule of Evidence 401, evidence is only admissible where "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."   "The Rule's basic standard of relevance thus

---

[3] The identities of, and entities controlled by, the Tippee Traders have been provided to the defendant through discovery and a proposed stipulation listing the trading records for each.

is a liberal one," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993), and "[d]istrict courts have broad discretion to assess whether evidence is relevant," *United States v. Ferguson*, 246 F.R.D. 107, 117 (D. Conn. 2007) (citing *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004)).

In the context of insider trading, the Second Circuit has approved of the admission of evidence of the trading patterns of other tippees where that evidence is probative of the charged conduct.  *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012).  The Court of Appeals in *Contorinis* affirmed then-District Court Judge Sullivan's admission of trading by other tippees "because they tended to show that the trades of the tippees were more consistent with the sharing of inside information than with independent investment decisions."  *Id.* at 141; *see also United States v. Ballesteros Gutierrez*, 181 F. Supp. 2d 350, 353 (S.D.N.Y. 2002) (admitting evidence of the details of other family members-tippees' trading because they were "more consistent with the sharing of the inside information to enable the family members to turn a quick profit with little or no risk, than with investment decisions independently arrived at on the basis of public information").

### C.  Discussion

The trading patterns of the Tippee Traders are highly relevant because they tend to show that these individuals – all of whom are connected to Nikas and/or ████████ – traded in Ariad based on MNPI.   For one thing, the fact that they traded Ariad in similar patterns strongly suggests that they were motivated to trade by specific facts that were revealed to them at specific times.   In other words, their parallel trading is strong proof that they each received MNPI about Ariad rather than, for example, each independently coming to the conclusion that it was a good time to trade in Ariad based on market research or other factors.   Moreover, the Tippee Traders' profits in Ariad also tend to show that they had MNPI.   In particular, the contrast between the substantial profit

based on trades made shortly before the Events, and the much smaller profits (or losses) based on trades made at other times, suggests that these traders were in possession of valuable MNPI.   The Government should thus be permitted to introduce this evidence at trial.

While, as set forth above, the Tippee Traders (including at least ██████████████ ██████ ) were co-conspirators of the defendant, there is substantial probative value to the Tippee Traders' trading patterns even if they were not co-conspirators.   Their trading records demonstrate that they received MNPI about Ariad, and other relevant evidence will show that that information came through Nikas.   In light of Nikas's connection to the defendant, evidence showing that numerous individuals connected with Nikas received MNPI about Ariad is thus highly probative of whether the defendant passed MNPI to Nikas in the first place.

The Second Circuit's opinion in *Contorinis* provides strong support for the Government's admission of these records.   In *Contorinis*, the Court considered whether to admit trading activity of other tippees who had received MNPI from the same tipper as the defendant.   *Id.* at 141. Notwithstanding that the other tippees were not in the same tipping chain as the defendant and were not his co-conspirators, Judge Sullivan admitted that trading evidence, reasoning that "the trading patterns of the other tippees were probative because they tended to show that the trades of the tippees were more consistent with the sharing of inside information than with independent investment decisions."   *Id.*   The Second Circuit affirmed, noting that whether to allow the introduction of such evidence is subject to "a case by case analysis."   *Id.* at 144.   In particular, the Second Circuit found that the introduction of the trading evidence was appropriate because the defendant there denied trading on MNPI.   *Id.* at 144.   This analysis strongly supports the introduction of the Tippee Traders' trading evidence here.   Like in *Contorinis*, this evidence will be highly probative of whether the defendant passed, and Nikas traded on, MNPI.   As the defendant is likely to deny ever passing Ariad MNPI to Nikas, this evidence will be crucial to

16

showing that Nikas's and others' trading was in fact based on MNPI.   Therefore, the evidence should be admitted.

This evidence will also not be unduly confusing or distracting to the jury.   The evidence will be presented in simple summary charts that include information about the traders and summaries of their trading.   There will be independent evidence at trial relating to who these Tippee Traders are; the jury therefore will be familiar with their names and their relationships with Nikas.   This evidence will provide the jury with an organized picture of Nikas's associates who traded in Ariad, which will inform the jury's assessment of whether the trading was based Nikas's sharing of Ariad MNPI.   There is thus no basis to exclude the evidence under Rule 403.   *See Contorinis*, 692 F.3d at 145 (affirming district court's conclusion that potential prejudice did not outweigh probative value).

Accordingly, the Government should be permitted to introduce evidence of the Tippee Traders' trading at trial.   The evidence is highly probative of the fact that these traders were collectively trading on inside information, and the evidence, and its relevance, will be presented in a simple and concise fashion.

### III.   The Government Should Be Permitted to Introduce Evidence About the Defendant's Understanding of Nikas's Other Insider Trading Activity

The Government also seeks a ruling permitting the introduction of evidence that the defendant and Nikas discussed insider trading activity other than Ariad.   This evidence is important to demonstrate that the defendant understood that Nikas engaged in insider trading and would thus use MNPI that he provided about Ariad to trade in Ariad securities.

#### A.   Relevant Background

As noted above, ███████████████████████ enjoyed a long-standing relationship with Nikas wherein ██████ obtained MNPI from numerous sources and shared some of that MNPI with Nikas, and that Nikas provided █████ with MNPI about Ariad.

███████████████████████████████████████ obtained MNPI from a source, identified in the Superseding Indictment as CC-3, regarding AmerisourceBergen Corp. ("ABC"). ███████████████████████████ provided the MNPI to Nikas. ████████████████████████ obtaining the ABC MNPI and providing it to Nikas is corroborated by trading records, which show both ██████ and Nikas purchasing ABC securities in or about February and March 2013, in advance of a public announcement by ABC about a corporate transaction (the "ABC Announcement") before the market opened on March 19, 2013.   The ABC Announcement caused the stock price of ABC to rise.   On March 19, 2013, ████████ sold his entire ABC position, and Nikas sold his ABC position between March 19 and 23, 2013.

As relevant to the instant motion, the Government intends to introduce at trial an email chain in the early morning of March 20, 2013, where the defendant first forwards to Nikas a Bloomberg news article relating to the ABC Announcement that had been published the day before, and Nikas replied a few hours later, writing "Yup...!!"   (the "ABC Email," attached hereto as Exhibit C).

### B.  Discussion

Evidence of and concerning the ABC Email is admissible both as direct evidence of the charged conspiracy and, in the alternative, pursuant to Rule 404(b).   First, by way of direct evidence, the Government intends to introduce the ABC Email for various reasons, including that (a) the defendant discussed investing with Nikas, and (b) the defendant understood that Nikas was interested in corporate announcements that made a company's stock price move and emailed Nikas an article about a corporate announcement that made a company's stock price rise.   This evidence is plainly relevant to establish both of these facts, which are central to the charged insider trading conspiracy.

18

Moreover, the jury is entitled to infer from the ABC Email that the defendant understood that Nikas traded based on inside information (and discussed inside information with others). Indeed, the fact that the defendant sent the ABC Announcement to Nikas without comment, and Nikas responded by merely writing "Yup…!!," indicates that the defendant knew *before the announcement* that Nikas had purchased ABC securities and was poised to profit based on the announcement.   Importantly, this email exchange occurs on March 20, 2013—mere months before the defendant began tipping Nikas with Ariad MNPI.   The evidence is thus directly relevant to the defendant's knowledge and intent when he then began discussing Ariad's secret corporate developments with Nikas.   *See, e.g.*, *United States v. Rutkoske*, 506 F.3d 170, 177-78 (2d Cir. 2007) (in securities fraud prosecution, affirming district court's admission of evidence of a subsequent securities fraud scheme four years after the charged fraud scheme under Rule 404(b) in order to prove knowledge).

Finally, to the extent the defense contends that Nikas misappropriated MNPI about Ariad from the defendant, this evidence would tend to negate that argument.   If the defendant well understood that Nikas was a securities trader, and/or that Nikas traded based on inside information in other securities, then the defendant would not casually discuss Ariad's business with Nikas unless he intended that Nikas would trade on that information.   The ABC Email provides important context for the Government to respond to that defense.   Accordingly, the Court should permit the Government to introduce the ABC Email and related evidence at trial.

## IV.  The Defendant Should Be Precluded from Offering Evidence that he was Notified of Legal Process on his Email Account in 2018

The defendant should be precluded from offering evidence that in or about April 2018, he was notified that Google had received legal process from the FBI compelling the release of information from his email account.   That information is irrelevant to this case and to the extent

the defendant intends to raise it as purported "consciousness of innocence" evidence, it will lead to a confusing and wasteful sideshow for the jury.

### A.   Relevant Background

During discovery in this matter, the defendant has produced an April 6, 2018 email sent from the email address "usernotice@google.com" to the email address "usernotice@google.com," notifying a "Google user" that, among other things, "Google received and responded to legal process issued by the Federal Bureau of Investigation (Southern District of New York) compelling the release of information related to your Google account" (the "Alert," attached hereto as Exhibit D).   During bail proceedings in this case, the defendant has argued that he did not present a risk of flight because, among other things, "even though he received notice more than a year earlier that the FBI had searched his emails, he was not hiding."   (*See* 11/12/2019 Bail Letter, ECF Dkt. No. 25 at 13-14).   Accordingly, the Government expects that the defendant may attempt to offer the Alert or other evidence at trial to demonstrate that the defendant lacked the requisite mental state when he committed insider trading in 2013 and 2015.

### B.   Applicable Law

As noted above, only relevant evidence may be admitted at trial.   Fed. R. Evid. 401.   Even where evidence is admissible, however, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   In particular, courts may exclude evidence that is only tangentially relevant and raises so many collateral and distracting issues that "the sideshow will swallow up the circus."   *Linde v. Arab Bank, PLC*, 04 Civ. 2799 (BMC), 2013 WL 4516778, at *1 (E.D.N.Y. Aug. 23, 2013).

Courts frequently preclude so-called "consciousness of innocence" evidence where the underlying conduct does not unequivocally demonstrate a belief in innocence, but rather, could be motivated by various considerations.   Thus, for example, courts have declined to admit proof that a defendant (1) refused to cooperate with law enforcement authorities, *United States v. Nguyen*, 507 Fed. App'x 64, 66 (2d Cir. Jan. 8, 2013) (summary order); (2) rejected a plea offer, *United States v. Greene*, 995 F.2d 793, 798-99 (8th Cir. 1993); *United States v. Goffe*r, No. 10 Cr. 56 (RJS) (S.D.N.Y. May 13, 2011) (order denying defendant's motion *in limine*); *United States v. Del Carmen*, No. 01 Cr. 420 (LAK), 2002 U.S. Dist. LEXIS 14030, at *1-3 (S.D.N.Y. Aug. 1, 2002); (3) rejected a deferred prosecution agreement, *United States v. Geisen*, 612 F.3d 471, 495-97 (6th Cir. 2010); *United States v. Wilson*, No. 98 Cr. 640 (DLC), 1998 WL 770561, at *1-4 (S.D.N.Y. Nov. 4, 1998); (4) produced documents in response to a subpoena notwithstanding possible grounds to refuse to do so, *United States v. Grant*, 338 Fed. App'x 19, 20-21 (2d Cir. 2009) (summary order); (5) cooperated with a police investigation, *Torres v. Smith*, No. 03 Civ. 906 (WHP), 2005 WL 1580608, at *8 (S.D.N.Y. July 6, 2005); and (6) consented to extradition, *United States v. Connolly*, 16 Cr. 370 (CM) (S.D.N.Y. May 15, 2018) (order denying defendant's motion *in limine*).   On rare occasions, and in circumstances that are not present here, courts have admitted consciousness of innocence.   *See, e.g.*, *United States v. Rajaratnam*, 13 Cr. 211 (NRB) (admitting evidence that defendant consented to extradition on criminal charges where the record clearly showed that defendant was not otherwise subject to extradition).

## C.  Discussion

The Alert and other evidence about a notification by Google fail to meet even the Federal Rule of Evidence's low standard for relevance.   First, the Alert on its face fails to convey any meaningful information about the circumstances of the "legal process" at issue.   For example, the Alert does not explain what legal process was issued, when any legal process was issued, or what

information was released from the account in response to legal process.   The Alert, therefore, did

not actually give the defendant notice (as he has argued) that "the FBI searched his emails," as

opposed to any other information from or regarding his account.   (ECF Dkt. No. 25 at 14).

Likewise the Alert does not explain why the information was requested, whether it was part of this

insider trading investigation, or what role if any the defendant played in such a potential

investigation.   In fact, it is not at all clear from the face of the Alert if and how it was ever even

received or read by the defendant.   Given that the Alert lacked *all* of these things, it could not

possibly have put the defendant on notice that he was the subject of an investigation that would

ripen into this criminal case and, therefore, the fact that he was "not hiding" (*id.*) after receiving it

is of no moment.

    The evidence is also not relevant because the defendant took no action upon receiving the

Alert demonstrating his innocence.   The defendant did not contact the FBI to inquire about the

existence of any investigation, or take other actions that courts have held might indicate

consciousness of innocence (*e.g.*, agree to face charges, refuse an offer of immunity, or otherwise

react to known criminal exposure in way that suggests innocence).   Instead, it appears that the

defendant was wholly unaware of any impending criminal charges at any point before his arrest in

October 2019.   In that respect, this case could not be more different than other relatively rare cases

where courts have admitted consciousness of innocence evidence.   For example, in *Rajaratnam*,

13 Cr. 211 (NRB), where Judge Buchwald admitted evidence of consciousness of innocence, the

defendant knew of criminal charges brought against him, would not have been extraditable to the

United States for those crimes, and yet agreed to face the charges.   By contrast, after receiving the

Alert the defendant apparently simply continued living a normal life.   That is not evidence of an

innocent mind; it is simply evidence that the defendant was unaware of the Government's criminal

case, and defendant has not shown that he took any action that would actually show a belief of his

innocence.[4]   Therefore, nothing about the Alert is relevant to the defendant's state of mind at this trial.

Moreover, even if there is some, slight relevance to the Alert, it should be precluded under Rule 403 because it is unduly prejudicial and risks creating a sideshow at trial.   Admitting the Alert will open the door to, among other things, evidence and argument about what actions the defendant has taken between April 2018 and the present, including patterns of the defendant's travel between April 2018 and the present (and how they differed, if at all, from prior periods). All of these facts will be necessary to put into context the defendant's argument about not "liv[ing] in hiding" in 2018 and 2019, and will be wasteful and confusing to a jury tasked with deciding whether the defendant committed insider trading from 2013 to 2015.

Accordingly, the defendant should be precluded from offering the Alert or other evidence about of the FBI's search of his email account in 2018.   Such evidence is irrelevant and would open the door to a needless and confusing sideshow at trial.

---

[4] To the extent that the defendant may argue that his travel to the United State after the Alert was probative of consciousness of innocence, that argument is defeated by the defendant's own repeated representations to the Court that he would have been extraditable from Greece (*see, e.g.* ECF Dkt. No. 11 ("The U.S.-Greece Extradition Treaty Expressly Allows Mr. Lavidas's Extradition If Necessary")) and thus he could not have escaped criminal prosecution by remaining in Greece.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Government respectfully requests that the Court grant

the Government's Motions *in Limine*.

Dated:  New York, New York
   December 11, 2019

             Respectfully submitted,

             AUDREY STRAUSS
             Attorney for the United States,
             Acting Under Authority Conferred by
             28 U.S.C. § 515

     By:   _____/s/_____
             Richard Cooper / Daniel Tracer
             Assistant United States Attorneys
             Tel. (212) 637-1027/2329